Cynthia BIRKNER, Plaintiff, Appellee, and Cross–Appellant,

v.

SALT LAKE COUNTY, Defendant and Appellant,

and

Michael Flowers, an individual, Defendant and Appellee.

No. 19966.

Supreme Court of Utah.

March 22, 1989.

David E. Yocum, Patricia J. Marlowe, Salt Lake City, for defendant and appellant Salt Lake County.

Phillip S. Ferguson, Salt Lake City, for defendant and appellee Flowers.

R. Scott Berry, Salt Lake City, for plaintiff, appellee, and cross-appellant.

STEWART, Justice:

This is an appeal and a cross-appeal from a judgment for damages based on the sexual misconduct of a Salt Lake County employee, Michael Flowers, a licensed social worker. On the principal appeal, the County contends that Flowers' conduct was outside the scope of his employment and that the County is not liable for his acts under the doctrine of respondeat superior. The County also appeals the trial court's judgment requiring it to indemnify Flowers for the damages awarded against him. The plaintiff, Cynthia Birkner, cross-appeals. She contends that the trial court erred in finding her comparatively negligent and reducing the award of damages in her favor.

## I. FACTS

Birkner and her ten-year-old son arrived in Salt Lake City in late November, 1981. For several weeks, she unsuccessfully searched for work and permanent living quarters. In desperation, she dialed the crisis line maintained by Salt Lake County's Intensive Treatment Unit (hereafter "ITU"), a county mental health facility, to find help in sending her son to friends in California. The ITU typically provides residential treatment, day treatment, hospital evaluation, social support, and crisis intervention. The defendant, Michael Flowers, was employed as a crisis worker at the ITU. He took the call and referred Birkner to the Division of Children's Services, which she called. Flowers, worried about Birkner's state of mind, made a home visit to her and persuaded her and her son to come to the ITU for help. During the next six weeks, Birkner and her son continued to receive help from the ITU and from Flowers. Birkner spent a number of nights at the ITU and attended several counseling sessions with Flowers. Flowers also met Birkner several times outside the ITU.

On January 18, 1982, Birkner went to the ITU to see Flowers, and prior to the commencement of a therapy session, Birkner sat on Flowers' lap and kissed him. At the completion of therapy, they kissed again, and Flowers fondled Birkner's breasts. Realizing that his actions were inappropriate, Flowers went to find a co-worker to stay with Birkner. In his absence, Birkner swallowed several anti-depressant capsules. She was briefly hospitalized as a result. The next day, January 19, 1982, Flowers claims he met twice with Birkner at the ITU and discussed what had occurred the day before. During the first meeting, he told her he did not think that he should have engaged in a physical relationship with her. Later that day, they met again, and after discussing Birkner's feelings, they again engaged in conduct that was inappropriate for a social worker under the circumstances.

Flowers did not inform any ITU staff members about his sexual activities with Birkner, but on January 20, 1982, he agreed when asked by his supervisors if she should be reassigned. Birkner did not complain about the sexual activities until the evening of January 20, 1982, when she told several ITU staff members.

Birkner thereafter left the ITU and was taken to L.D.S. Hospital, where she remained for twenty days. While at the hospital, Birkner underwent psychiatric treatment and was diagnosed as having a multiple personality disorder, which was caused by sexual abuse she had suffered as a child.

Birkner filed an action against Flowers and Salt Lake County. Her complaint included claims of sexual battery and negligence against Flowers and claims of negligent supervision and vicarious liability on the part of the County. Flowers requested Salt Lake County to defend him. The County asserts that he did not do so within the ten-day period required by Utah Code Ann. § 63–48–3(1) (1978) (repealed 1983). The County agreed to defend him under a reservation of right based on its contention that his conduct was outside the scope of his employment. Thereafter, Flowers' own malpractice insurer retained counsel to represent him.

At trial, Flowers admitted that he had kissed and fondled Birkner and that his conduct fell below the standard of care exercised by social workers in the community. Neither Birkner nor Flowers contended that their sexual interaction was part of therapy. The trial court determined, as a matter of law, that Flowers was guilty of negligence with respect to his treatment of the plaintiff. The basis of this ruling was an admission by Flowers. The issue of sexual battery was omitted from the jury instructions.

By special verdicts, the jury found Flowers 50 percent negligent, the County 40 percent negligent, and Birkner 10 percent negligent and awarded Birkner $13,999.83 less 10 percent for her own negligence. During the jury's deliberation, the County moved for a directed verdict on the ground that it was not liable for Flowers' conduct under the doctrine of respondeat superior. The trial court denied the County's motion and granted Flowers' motion for summary judgment on his cross-claim for indemnification. After the jury returned its verdict, the County moved for a judgment notwithstanding the verdict. The motion was denied.

## II. SCOPE OF EMPLOYMENT

We consider first the County's argument that the trial court should have granted its

motion for a judgment notwithstanding the verdict on the basis that Flowers' sexual misconduct was outside the scope of his employment and that the County was therefore not liable under the doctrine of respondeat superior. In the factual context of this case, the issue is whether improper sexual contact between a therapist and a patient falls within the scope of the therapist's employment.

W. Keeton, *Prosser and Keeton on the Law of Torts* § 70, at 502 (5th ed. 1984) states the basic function that the term "scope of employment" serves in respondeat superior cases:

It [scope of employment] refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.

As in the case of the existence of the relation itself, many factors enter into the question: the time, place and purpose of the act, and its similarity to what is authorized; whether it is one commonly done by such servants; the extent of departure from normal methods; the previous relations between the parties; whether the master had reason to expect that such an act would be done; and many other considerations.... [I]n general the servant's conduct is within the scope of his employment if it is of the kind which he is employed to perform, occurs substantially within the authorized limits of time and space, and is actuated, at least in part, by a purpose to serve the master.

(Footnotes omitted.)

■ Utah cases have tended to focus on three criteria for determining when the conduct of an employee falls within the scope of employment.[1] First, an employ-

1. The Restatement (Second) of Agency § 228 (1958) definition of "scope of employment" corresponds to various statements of this Court

defining scope of employment. Section 228 provides in part:
(1) Conduct of a servant is within the scope of employment if, but only if:

ee's conduct must be of the general kind the employee is employed to perform. *See Keller v. Gunn Supply Co.*, 62 Utah 501, 220 P. 1063 (1923) (citing *Hardeman v. Williams*, 150 Ala. 415, 43 So. 726, 10 L.R.A. 653 (1907)); Restatement (Second) of Agency § 228(1)(a) (1958). That means that an employee's acts or conduct must be generally directed toward the accomplishment of objectives within the scope of the employee's duties and authority, or reasonably incidental thereto. In other words, the employee must be about the employer's business and the duties assigned by the employer, as opposed to being wholly involved in a personal endeavor. *Keller*, 62 Utah at 505, 220 P. at 1064.

Second, the employee's conduct must occur within the hours of the employee's work and the ordinary spatial boundaries of the employment. *See Cannon v. Goodyear Tire & Rubber Co.*, 60 Utah 346, 208 P. 519 (1922); Restatement (Second) of Agency § 228(1)(b).

■ Third, the employee's conduct must be motivated, at least in part, by the purpose of serving the employer's interest. *See Stone v. Hurst Lumber Co.*, 15 Utah 2d 49, 51, 386 P.2d 910, 911 (1963); *Combes v. Montgomery Ward & Co.*, 119 Utah 407, 411, 228 P.2d 272, 274 (1951) ("within the scope of furthering [employer's] purpose"); *Barney v. Jewel Tea Co.*, 104 Utah 292, 296, 139 P.2d 878, 879 (1943). *Cf. Carter v. Bessey*, 97 Utah 427, 431, 93 P.2d 490, 492 (1939) (employer not liable when employee's conduct intended "for purposes other than the master's business"). Thus, as *Combes* and *Carter* make clear, an employee's purpose or intent, however misguided in its means, must be to further the employer's business interests.[2] *See also Prosser and Keeton* § 70, at 503–05.

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

■ If the employee acts "from purely personal motives ... in no way connected with the employer's interests" or if the conduct is "unprovoked, highly unusual, and quite outrageous," then the master is not liable. *Id.* at 506. *Prosser and Keeton* illustrates the latter point by reference to various cases including three sexual assault cases. *Id.* at 506 n. 48. For purposes of liability under the doctrine of respondeat superior, it is not generally relevant whether the sexual misconduct is categorized as an intentional or negligent tort. *See Cosgrove v. Lawrence*, 214 N.J.Super. 670, 520 A.2d 844 (Law Div.1986) (initial physical relationship between therapist and patient began as a "mishandling" of the "transference" phenomenon), *aff'd*, 215 N.J.Super. 561, 522 A.2d 483 (App.Div.1987). *But see Marston v. Minneapolis Clinic of Psychiatry and Neurology, Ltd.*, 329 N.W.2d 306 (Minn.1983).

■ As a general rule, the issue of whether an employee acted within the scope of employment is a factual question to be decided by the trier of fact. *See, e.g., Barney*, 104 Utah at 296–97, 139 P.2d at 879–80. The scope of employment issue must be submitted to the jury "[w]henever reasonable minds may differ as to whether the [employee] was at a certain time involved wholly or partly in the performance of his master's business or within the scope of his employment...." *Carter*, 97 Utah at 432, 93 P.2d at 493. Some conduct, however, is so clearly outside the scope of employment that the issue may properly be decided by the trial judge as a matter of law. *See, e.g., Stone*, 15 Utah 2d at 51, 386 P.2d at 911; *Keller*, 62 Utah 501, 220 P. 1063. A California district court of appeals has stated:

> Whether there has been a deviation so material or substantial as to constitute a complete departure is usually a question
>
> ....

**2.** It is clear, however, that this requirement does not preclude a master's liability for the intentional torts of a servant, even such torts as assault, fraud, and defamation. W. Keeton, *Prosser and Keeton on the Law of Torts* § 70, at 503–07 (5th ed. 1984).

of fact. In some cases the deviation may be so marked, and in others so slight relatively, that the court can say that no conclusion other than that the act was or was not a departure could reasonably be supported....

*Kruse v. White Bros.*, 81 Cal.App. 86, 93, 253 P. 178, 181 (1927) (cited with approval in *Carter*, 97 P.2d at 432, 93 P.2d at 492–93).

■ Although Flowers' misconduct took place during, or in connection with, therapy sessions, it was not the general kind of activity a therapist is hired to perform. More critical, it was not intended to further his employer's interest. On the contrary, it served solely the private and personal interests of Flowers. Neither Flowers nor Birkner thought their sexual conduct was part of therapy—the service that Flowers was hired to provide. Flowers' conduct arose from his own personal impulses, and not from an intention to further his employer's goals. Nor did his conduct in any way, inappropriately or otherwise, further those goals. He in fact admitted that his purpose was not to further the interest of his employer.

Furthermore, it is well accepted that sexual activity between therapist and patient is not related to the master's objectives or interests. Indeed, it was specifically forbidden by the policy and procedures manual of the County clinic. Also, Flowers was a certified social worker licensed by the Utah Division of Occupational and Professional Licensing, under the provisions of Utah Code Ann. § 58-35-1 to –14 (1986). He was, therefore, subject to the rules and regulations of the Utah Department of Business Regulation. Rule R 153-35-5B1.-e., 1 Utah Admin.Code 352 (1987), states: "The social worker shall under no circumstances engage in sexual activities with clients."

■ Flowers had a professional duty to act in conformity with this rule and the rule of his employer while acting as a social worker for the County. We acknowledge that an employer's rule prohibiting certain conduct by employees is not generally dispositive by itself of the issue of scope of employment, *Prosser and Keeton* § 70, at 502–03, but the rules noted above also define the proper role of a professional therapist in a therapeutic relationship. They are therefore more than ordinary work rules that define improper conduct by employees.

Thus, the admitted purpose of Flowers was not to further the employer's interest, but only a personal interest, and his conduct was strictly prohibited both by the employer's work rules and the rules governing his professional conduct. The facts pertaining to these two propositions are undisputed. For these reasons, we hold that reasonable minds could not disagree with the conclusion that the sexual contacts in this case were not within the scope of Flowers' employment.

Our conclusion here is supported by rulings in other jurisdictions holding as a matter of law that the sexual misconduct of an employee is outside the scope of employment. *See, e.g., Andrews v. United States*, 732 F.2d 366, 370 (4th Cir.1984) (seduction of patient by physician's assistant); *Doe v. United States*, 618 F.Supp. 503, 506 (D.S.C. 1984), *aff'd*, 769 F.2d 174 (4th Cir.1985) (Air Force counselor exposed himself and suggested sexual acts to a patient); *Milla v. Tamayo*, 187 Cal.App.3d 1453, 1462, 232 Cal.Rptr. 685, 690 (1986) (repeated acts of intercourse between seven priests and female parishioner provides "no basis for imputing liability" to the church); *Community Theatres Co. v. Bentley*, 88 Ga.App. 303, 76 S.E.2d 632 (1953) (sodomy committed by theater manager upon minor); *Hoover v. University of Chicago Hosps.*, 51 Ill.App. 3d 263, 9 Ill.Dec. 414, 366 N.E.2d 925 (1977) (intentional sexual assault of patient by doctor); *Bozarth v. Harper Creek Bd. of Educ.*, 94 Mich.App. 351, 288 N.W.2d 424 (1979) (homosexual assault by teacher on student); *Cosgrove v. Lawrence*, 214 N.J. Super. 670, 520 A.2d 844 (Law Div.1986), *aff'd*, 215 N.J.Super. 561, 522 A.2d 483 (App.Div.1987) (sexual relationship between therapist and patient); *Taylor v. Doctors Hosp. (West)*, 21 Ohio App.3d 154, 486 N.E. 2d 1249 (1985) (sexual assault by hospital orderly). *Contra Lyon v. Carey*, 533 F.2d 649 (D.C.Cir.1976) (question of fact wheth-

er delivery company is liable where sexual assault is triggered or occasioned by dispute over conduct of business); *White v. County of Orange,* 166 Cal.App.3d 566, 571–72, 212 Cal.Rptr. 493 (1985) (county held civilly liable for deputy sheriff's threat of rape because it was done under authority of deputy sheriff, an agent of the county); *Marston v. Minneapolis Clinic of Psychiatry and Neurology, Ltd.,* 329 N.W.2d 306 (Minn.1983) (question of fact whether sexual acts committed by psychologist during patient's therapy sessions were within scope of psychologist's employment). *See generally* Annotation, *Liability of Hospital or Clinic for Sexual Relationships with Patients by Staff Physicians, Psychologists, and other Healers,* 45 A.L.R.4th 289 (1986).

In sum, Flowers' conduct was outside the scope of his employment as a matter of law, and the County's motion for a judgment notwithstanding the verdict should have been granted.

### III. NEGLIGENT SUPERVISION

The County argues that there is no evidence that it was negligent, apart from its liability for Flowers' conduct, and that sovereign immunity bars any such liability.

■ Even when the doctrine of respondeat superior is inapplicable, an employer may be liable for its negligence in the hiring or supervision of an employee. *See, e.g., Johnson v. Rogers,* 763 P.2d 771 (Utah 1988); *Stone,* 15 Utah 2d at 49, 386 P.2d at 910. *See also Andrews,* 732 F.2d at 370 (hospital held liable for negligent supervi-

sion of physician's assistant who seduced patient). Birkner contended at trial that the County was negligent in failing "to supervise defendant Flowers so as to prevent misconduct with female patients," and she contends that there was evidence to support that theory.

■ Utah Code Ann. § 63–30–3 (1986) [3] provides that "all governmental entities are immune from suit for any injury which results from the exercise of a governmental function, governmentally-owned hospital, nursing home, or other governmental health care facility...." The ITU is a "governmental health care facility." The first clause of the statute, "[e]xcept as otherwise provided in this chapter," establishes that the immunity provided is subject to the exception for negligence under Utah Code Ann. § 63–30–10 (1986). Section 63–30–10 permits an action against the state and its political subdivisions for negligent acts or omissions of employees committed within the scope of employment, with some exceptions not relevant here.[4]

■ Therefore, the County could be liable for negligent supervision of Flowers, if there is substantial evidence to support the theory. Our review of the record indicates there is sufficient evidence to support the conclusion.[5]

### IV. INDEMNIFICATION

■ The County also contends that Flowers was not entitled to indemnification because he failed to serve the County with a demand for indemnification within ten

---

3. This section provides immunity for governmentally owned health facilities:

   Except as may be otherwise provided in this chapter, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function, governmentally-owned hospital, nursing home, or other governmental health care facility, and from an approved medical, nursing, or other professional health care clinical training program conducted in either public or private facilities.

4. Section 63–30–10(1) provides that "immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within

the scope of employment" unless certain specified exceptions are applicable. Subsection 63–30–2(3) defines "governmental entity" as "the state and its political subdivisions...."

5. The case was submitted to the jury on the basis of special verdicts. The verdict dealing with the County's liability is somewhat unclear as to whether liability was predicated on respondeat superior liability for Flowers' conduct or negligent supervision. The parties on this appeal seem to assume that it was predicated on both. Because the issue has not been raised on appeal, we do not address the issue. As noted in the text, however, there is evidence to support the theory of negligent supervision.

days as required by Utah Code Ann. § 63–48–3(1) (1978) (repealed 1983), which was in effect at the time of trial, and because his misconduct was not within the scope of employment under the language of Utah Code Ann. § 63–48–4(2) (1978) (repealed 1983), which provided:

If the public entity does not conduct the defense of an officer or employee against a claim or does conduct this defense under an agreement as provided in subsection 3 of section 63–48–3, the officer or employee may recover from the public entity ... only if:

(a) He establishes that the act or omission upon which the judgment is based occurred during the performance of his duties, *within the scope of his employment....*

(Emphasis added.) Since Flowers did not act within the scope of his employment, he was not entitled to indemnification.

## V. COMPARATIVE NEGLIGENCE

The plaintiff cross-appeals the jury's assessment of 10 percent negligence against her on the ground that a mentally ill patient cannot be negligent in her own mental health treatment. The County argues that the plaintiff must act as a reasonable person to avoid injury to herself. It asserts that she contributed to her own injuries by initiating and consenting to sexual conduct with Flowers. As a general proposition, a patient may negligently contribute to his or her injuries, notwithstanding a physician's negligence. *See, e.g., Paull v. Zions First National Bank,* 18 Utah 2d 183, 417 P.2d 759 (Utah 1966), *overruled on other grounds, Swan v. Lamb,* 584 P.2d 814 (Utah 1978). *Accord Brazil v. United States,* 484 F.Supp. 986 (N.D.Ala.1979); *Grippe v. Momtazee,* 705 S.W.2d 551 (Mo. Ct.App.1986); *Coyne v. Cirilli,* 45 Or.App. 177, 607 P.2d 1383 (1980).

■ In the case of a mentally ill plaintiff, the plaintiff's mental impairment may be taken into account by the jury. Historically, persons suffering from impaired mental capacity have been held responsible for their primary negligence. "Unless the actor is a child, his insanity or other mental deficiency does not relieve the actor from liability for conduct which does not conform to the standard of a reasonable man under like circumstances." Restatement (Second) of Torts § 283B (1965). In contrast to the use of an objective standard in cases of primary negligence, the majority of courts have adopted a more compassionate stance regarding the contributory negligence of the mentally impaired. Those who are insane are incapable of contributory negligence, whereas lesser degrees of mental impairment should be considered by the jury in determining whether the plaintiff was contributorily negligent. *See Baltimore & Potomac R.R. v. Cumberland,* 176 U.S. 232, 238, 20 S.Ct. 380, 382, 44 L.Ed. 447 (1900); *Seattle Electric Co. v. Hovden,* 190 F. 7, 9 (9th Cir.1911); *Snider v. Callahan,* 250 F.Supp. 1022, 1023 (W.D. Mo.1966); *De Martini v. Alexander Sanitarium, Inc.,* 192 Cal.App.2d 442, 447–48, 13 Cal.Rptr. 564, 566–67 (1961); *Noel v. McCaig,* 174 Kan. 677, 685–86, 258 P.2d 234, 240–41 (1953); *Young v. State,* 92 Misc.2d 795, 796–97, 401 N.Y.S.2d 955, 956–57 (Ct.Cl.1978). *See generally,* Note, *Tort Liability of the Mentally Ill in Negligence Actions,* 93 Yale L.J. 153, 157–58 (1983). This rule has also been applied in comparative negligence jurisdictions. *See Emory University v. Lee,* 97 Ga.App. 680, 104 S.E.2d 234 (1958); *Miller v. Trinity Medical Center,* 260 N.W.2d 4 (N.D.1977); *Golden Villa Nursing Home, Inc. v. Smith,* 674 S.W.2d 343 (Tex.Ct.App.1984).

■ We see no reason to depart from that rule. Mental impairments and emotional disorders come in infinite degrees and with an infinite variety of types of impairment. Some persons' disorders may have nothing to do with the exercise of sound judgment in contexts where a third person's negligence causes injury. A patient seeking professional help for a certain kind of disorder may be more or less negligent depending on the nature and extent of the disorder. Those same factors will also determine in part the extent of the therapist's negligence. To apply a categorical rule that no patient seeking therapy for a mental or emotional disorder can be

charged with negligence would be unrealistic and cause damage to the principle of comparative negligence. We do recognize, however, that Flowers was responsible to control and direct the therapy sessions. No doubt the jury took that into account in attributing only 10 percent negligence to Birkner.

We conclude that the issue of comparative negligence was properly submitted to the jury.

## VI. EVIDENCE OF PLAINTIFF'S PRIOR SEXUAL CONDUCT

Birkner argues that cross-examination concerning her sexual relationships with her ex-husband and her former boy friend and sexual abuse inflicted upon her as a child by her father was irrelevant and prejudicial.

■ Since Birkner did not object at trial to the questions about her sexual relations with her father, the objections were waived, and we will not address the issue. Utah R.Evid. 103(a)(1). We do note, however, that it was Birkner herself who introduced the evidence of her father's sexual abuse, apparently to establish her own mental infirmities. The defense was clearly entitled to cross-examine her about the fact, the nature, and the effect of her father's abuse.

■ Birkner also asserts that defense counsel improperly cross-examined her concerning her sexual relations with prior male friends. However, the record shows that the trial judge, in fact, sustained her objections to those questions. Only the defendant's questions as to her sexual relations with her former spouse were permitted over the plaintiff's objections. Specifically, the plaintiff was asked the following:

Q. Did you ever engage in sexual relations with Mr. Birkner while you were married to him?

. . . .

A. Yes. I did.

Q. Did Mr. Birkner ever kiss you?

A. Yes. He did.

Q. And did he ever touch your breast while you were—

Plaintiff's counsel then objected and was overruled.

It is difficult to understand why Birkner contends that this evidence was improper. While such evidence may bruise a person's sensibilities, it was not a gratuitous diversion made for the sole purpose of embarrasing her. The jury was entitled to consider Birkner's prior experience in assessing damages. Flowers was entitled to try to demonstrate that Birkner's condition was not worsened by her sexual relations with Flowers.

Reversed as to the trial court's judgment imposing liability on the County for the 50 percent comparative negligence of employee Flowers, and remanded for entry of judgment against Flowers consistent with this opinion. Affirmed as to the County's 40 percent comparative negligence liability for negligent supervision of Flowers and as to Birkner's 10 percent comparative negligence.

HALL, C.J., HOWE, Associate C.J., DURHAM and ZIMMERMAN, JJ., concur.